IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>VIVIANNA LOPEZ, et al. | No. 21 CR 371<br><br>Judge Matthew F. Kennelly |

**DEFENDANT VIVIANNA LOPEZ'S**
**<u>MOTION TO DISMISS</u>**

Telling the cops is a surefire way to end a conspiracy. That makes good common sense. A laundering conspiracy to conceal the source of drug money probably ends when a defendant tells law enforcement about it.

Accordingly, Defendant VIVIANNA LOPEZ, by her attorney, MIANGEL C. CODY, submits this Motion to Dismiss the Indictment on two grounds. First, Ms. Lopez moves to dismiss Count 1 (money laundering conspiracy) on statute of limitations grounds because the government's Indictment fell outside of the limitations period. Second, Ms. Lopez moves to dismiss the Indictment entirely because there exists an enforceable nonprosecution agreement.

In further support of the relief requested, we state as follows:

### I.    THE FACTS

In November 2018 in the Eastern District of New York, trial commenced for Joaquin Guzman Loera, who is commonly referred to as "El Chapo" and the reputed leader of the Sinaloa Cartel. After years of interviews and trial preparation, Pedro Flores testified on

1

behalf of the prosecution at the El Chapo trial. Mr. Flores's direct examination began on December 18, 2018. On direct, the government elicited the following testimony from Flores:

> PROSECUTOR: Was your wife ever charged with collecting drug debts?
>
> PEDRO FLORES: No, she was given immunity.
>
> . . .
>
> PROSECUTOR: Now, from the outset, when you were asked by the agents, prosecutors, did you acknowledge the roles that your immediate family had played in collecting the drug debt?
>
> PEDRO FLORES: Yes.

On cross examination, defense counsel for Mr. Guzman-Loera again asked cooperating witness Pedro Flores about whether his wife received prosecutorial immunity, notwithstanding her alleged involvement in collecting and hiding drug proceeds.

> EL CHAPO DEFENSE COUNSEL: Your wife never got charged with it, did she?
>
> PEDRO FLORES: No. She received immunity.[1]

Mr. Flores's statement was not a non-responsive, aberrational utterance. It had context. And that context was years of cooperation, proffers, and investigation. This Motion to Dismiss rests upon a timeline of facts taken from the following DEA reports.[2]

---

[1] *United States v. Joaquin Guzman Loera*, 1:09 CR 466, ECF No. 638 at 3540, 3718 (S.D. NY).

[2] The following facts are taken from DEA-6 reports produced by the government in this case. Pursuant to the Court's protective order, copies of the referenced discovery and law enforcement reports will be tendered to Chambers. Unless so ordered, undersigned counsel will not file cited discovery on the public record.

2

### A. October 28, 2010: Proffer of Pedro Flores

In 2008, Pedro Flores began cooperating with the government against two Mexican cartels. Flores underwent hundreds of hours of debriefing and law enforcement interviews. On October 28, 2010, N.D. Illinois prosecutors and agents conducted a proffer session of Flores. See Ex. A: Pedro Flores DEA Proffer Report.[3] The meeting occurred in the presence of Mr. Flores's counsel. Ex. A at 1.

The government has produced a DEA Report that summarizes the meeting as follows: During the proffer meeting, the government asked Flores about his family's involvement in collecting drugs debts and concealing proceeds of his drug organization. Flores advised that, even after his cooperation commenced, he had directed his family to continue collecting drug debts. Flores told federal agents that, in late 2008, while cooperating, he directed a family member to "collect outstanding drug debts from his drug customers." Ex. A at 2. Flores proffered to federal agents that several million dollars of drug proceeds were collected and transported in a moving van to Chicago. Ex. A at 2. Flores told the government that his wife Vivianna Lopez and Valarie Gayton had unloaded the money from the moving van and stored it at a house " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. A. at 2. Flores told the government that "he did not know how much money his family members brought with him when they left Mexico," Ex. A at 1, and "his plan was for ▮▮▮▮▮▮ to collect the outstanding drug proceeds and ▮▮▮▮▮▮▮ would get five million and ▮▮▮▮▮▮▮ would get five million." Ex. A at 3.

---

[3] *See* Exhibit A: DEA-6 Report prepared October 29, 2010, pertaining to proffer session of Pedro Flores.

3

Finally, Flores told federal agents that his family members had used the drug proceeds ███████████████████████ "to live on" and "he knows family members have spent money living since leaving Mexico and coming [to] the U.S...." Ex. A at 3,4.

Critically, the foregoing facts were disclosed to the government over a decade ago and memorialized in a DEA Report dated October 29, 2010.

### B. March 24, 2011: Proffer of Valarie Gayton

On March 24, 2011, the government interviewed Valerie Gayton regarding the monetary assets of ███████████████ and ████████████████ *See* Ex. B: Gayton DEA Interview. The meeting occurred in the presence of Ms. Gayton's counsel.

According to a DEA Report dated March 25, 2001, Ms. Gayton disclosed the following facts during her interview:



4

Ex. B. at 3,4.

In addition to the money stored in the ▮▮▮▮▮▮▮ floorboards, Ms. Gayton also disclosed to agents that "there should have been at least $500,000.00 USC left secreted in the Mazda that was parked in the garage ▮▮▮▮▮▮▮." Ex. B. at 6.

In October 2010, Vivianna Lopez and Valarie Gayton removed money from the ▮▮▮▮▮▮▮ floorboards and delivered the money to a Chicago-area defense lawyer (▮▮▮▮▮▮▮). Ex. B at 7. Attorney ▮▮. contacted the government, disclosed the existence of the funds, and sought guidance from federal prosecutors. The lawyer then placed the money into an escrow account. The total placed in the attorney escrow account was "over $4,000,000 USC." Ex. B at 7.

The DEA report reveals that, by March 24, 2001, federal agents knew Valarie Gayton (formerly Rangel) and Vivianna Lopez had "stored over $5,000,000.00 USC in drug proceeds ▮▮▮▮▮▮▮ in 2009 and 2010. The DEA report further indicates that a "Criminal defense attorney in October of 2010 accepted over $4,000,000.00 USC of drug proceeds from Valerie Gayton and Vivian Flores." Ex. B at 9.

Critically, the foregoing facts were disclosed to the government over a decade ago and memorialized in a DEA memorandum dated March 25, 2011.

### C. October 28, 2011: Proffer of Vivianna Lopez

On October 28, 2011, the government conducted a proffer-protected interview of Vivianna Lopez. In the presence of counsel, Ms. Lopez had "agreed to talk about her knowledge of the assets relating to her husband, Peter Flores [sic], international narcotics operation." *See* Ex. C: Lopez DEA Proffer. According to a DEA Report dated November 1,

5

2011, Ms. Lopez told the government that she collected drug debts for her husband and "knew the money was from P. Flores drug proceeds…" Ex. C at 3. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. C at 3,4.

Critically, the foregoing facts were disclosed to the government over a decade ago and memorialized in a DEA memorandum dated October 28, 2011.

### D. January 14, 2015: The Government's Sentencing Memorandum for Pedro Flores

The United States Attorney's Office for the Northern District of Illinois filed its sentencing memorandum in Pedro Flores's case on January 14, 2015.[4] By then, nearly five years had passed since Vivianna Lopez, her husband and her sister-in-law Valarie Gayton had disclosed the following critical facts to the government:

- As part of a "plan," several million dollars of drug proceeds were transported by a moving van into Chicago at Pedro Flores's direction after he began cooperating.

- Vivianna Lopez and Valarie Gayton "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The women had stored drug proceeds in a car and the floorboard at the home.

- Over $5 million was stored ▮▮▮▮▮▮▮▮▮▮▮▮

- Only approximately $4 million was surrendered to the government through a local criminal defense lawyer.

- Ms. Lopez and Ms. Gayton had used some of the proceeds to pay for personal expenses.

---

[4] *United States v. Pedro Flores*, 1:09 CR 383, ECF No. 373 (N.D. IL).

In its 2015 sentencing memorandum, the government characterized Flores's cooperation as "unparalleled" because it "enabled the government to completely dismantle the Flores brothers' own organization and convict over a dozen large-scale domestic customers." Further the government has stated Pedro Flores's cooperation occurred "[d]espite great personal risk to themselves and their families."[5]

The government's sentencing memorandum specifically addressed Mr. Flores's admissions that he had continued selling cocaine and collecting drug debts after he began cooperating:

> The government's investigation revealed allegations that the Flores brothers facilitated the collection of millions of dollars of drug proceeds from customers in the United States who still owed debts to the Flores brothers. The allegations continued that the Flores brothers had caused this money to be secreted from the government through multiple means, including through burying money in various locations. In response to this information, the government took several investigative steps, including exhaustive asset checks of the Flores brothers, their family members, and associates, as well as the simultaneous and separate interview of the Flores brothers and their family. The Flores brothers both admitted to causing their associates to collect approximately several million dollars of drug proceeds from a customer in the Washington D.C. area shortly after their arrival in Chicago in December 2008. The Flores brothers further admitted that they took these actions without reporting them to the government, even though they were otherwise actively cooperating.

The government acknowledged to this Court that it knew the concealed drug proceeds existed and that the money had been used by family members for "impermissible reasons."

> This money was then transported back to Chicago and used by the Flores brothers and their families, at times for impermissible reasons, without informing the government, including for the purchase of a Bentley as a gift for Pedro Flores's wife and other wholly inappropriate expenditures. The remainder of the funds collected, totaling more than $4 million, minus $300,000 total that was provided to the Flores family to provide for their

---

[5] *Id.*

> sustenance and security and legal fees paid to their attorneys, were voluntarily surrendered to the government and are subject to forfeiture pursuant to the terms of the defendant's plea agreements and the agreed motion for a preliminary order of forfeiture filed with this Court.

Importantly, the government told this Court that it had provided immunity to family members involved with collecting and storing drug proceeds:

> The government went to elaborate lengths to determine whether the Flores brothers were truthful in the information they provided, **including the immunization of those involved in the pickup and transportation of the money to determine whether any additional funds were being hidden from the government**. The government found no evidence of the existence of additional funds. Without credible evidence to the contrary, and after an exhaustive investigation, the government does not believe that the Flores brothers are hiding assets from the government or this Court.

### E.   December 2018: Trial Testimony of Pedro Flores

Against this backdrop of facts and particularly the government's sentencing memo in his case, it is not surprising that, in 2018, Pedro Flores testified at El Chapo's trial that his wife received immunity. Mr. Flores testified as to her immunity both on direct and cross examination. Understandably, trial prosecutors in the Eastern District of New York did not make any effort to dispute that fact during the trial. The Northern District of Illinois prosecutor's 2015 sentencing memorandum clearly stated it had granted "immunization of those involved in the pickup and transportation of the money." *United States v. Pedro Flores*, 1:09 CR 383, ECF No. 373 at 19. It was reasonable for Mr. Flores, the United States Attorney's Office for the Eastern District of New York, and Ms. Lopez to believe that representation in the NDIL USAO's sentencing memorandum. Otherwise, our district's U.S. Attorney is gaslighting us all.

8

## II.   ARGUMENT

Ms. Lopez moves to dismiss the Indictment on two grounds. *First*, she moves to dismiss Count 1 (money laundering conspiracy) on statute of limitations grounds. Over a decade ago, defendants disclosed the existence and source of the funds they are now charged with laundering. They did so during multiple meetings with federal prosecutors and agents.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Ex. C at 3 - 5.

The general rule is that a conspiracy continues for statute-of-limitation purposes so long as any action is taken in furtherance of the conspiracy. *See United States v. Vivit,* 214 F.3d 908, 918 (7th Cir. 2000). However, to the extent an illegal conspiracy existed in this case, it terminated when Ms. Lopez and her co-defendants disclosed every element of the alleged offense to federal prosecutors in 2011. *United States v. Steele*, 685 F.2d 793, 801 (3d Cir. 1982). Here, the conspiracy terminated no later than October 28, 2011, when Ms. Lopez proffered to the government. "Furtherance of the concealment objective, if it continued to that date, was terminated by the disclosure. Thus, no conduct after that date furthered the purposes of the illegal conspiracy alleged in the indictment." *Id.* at 801.

*Second*, Ms. Lopez moves to dismiss the Indictment because there is an enforceable nonprosecution agreement. In 2015, the government filed a sentencing memorandum to this Court, explicitly stating it granted "immunization [to] those involved in the pickup and

9

transportation of the money." In 2018, Mr. Flores testified under oath that his wife received immunity. In 2019, the government wrote a letter endorsing the fact that Mr. Flores's testimony had been truthful. Regardless of whether the testimony was intentionally elicited or not, the effect remains the same. A constellation of facts – the government's 2015 Flores sentencing memo, Flores's 2018 El Chapo trial testimony, and the government's subsequent letter endorsement of the testimony – taken together create a reasonable expectation of immunity and the government should be estopped from breaching that agreement in this case.

### A. Count 1: The Money Laundering Conspiracy Count was Filed After the Statute of Limitations.

> *"Furtherance of the [conspiracy's] concealment objective . . . terminated by the disclosure [to federal prosecutors]. Thus no conduct after that date furthered the purposes of the illegal conspiracy alleged in the indictment."*
>
> — *United States v. Steele*, 685 F.2d 793, 801 (3d Cir. 1982)

Ms. Lopez moves the dismiss Count 1 (money laundering conspiracy) because the statute of limitations had expired.[6]

Ms. Lopez was indicted on June 9, 2021. Count 1 charges: "Beginning in no later than in or about December 2008, and continuing until at least on or about March 2020," Ms. Lopez and others conspired to conduct or attempted to conduct financial transactions designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control, of drug proceeds. Under 18 U.S.C. § 3282, an indictment for a non-

---

[6] Co-defendant Laura Lopez joins Ms. Vivianna Lopez's motion to dismiss Count 1 on statute of limitations grounds.

capital offense must be brought within five years "after such offense shall have been committed." An offense is "committed" for purposes of § 3282 when it is "completed ..., that is, when each element of that offense has occurred." *United States v. Yashar,* 166 F.3d 873, 875 (7th Cir.1999). The general five-year statute of limitations, 18 U.S.C. § 3282, applies to prosecutions for violations of the money laundering and structuring statutes. *United States v. Upton,* 559 F.3d 3, 7 (1st Cir. 2009). Because Ms. Lopez is charged with a continuing offense, the threshold question for the Court is *when* the conspiracy was committed (that is, completed such that each element of the offense had occurred).

A conspiracy continues for statute-of-limitation purposes so long as any action is taken in furtherance of the conspiracy. *See United States v. Vivit,* 214 F.3d 908, 918 (7th Cir.2000); *Yashar,* 166 F.3d at 875 ("[t]he classic example of a continuing offense is a conspiracy"). A charge of conspiracy to launder money requires proof that the defendant knowingly was involved with "at least one other person [who has] agreed with him to commit" an act of money laundering, *United States v. McBride*, 724 F.3d 754, 756 (7th Cir. 2013), and that the defendant "knew the proceeds used to further the scheme were derived from illegal activity," *United States v. Arthur*, 582 F.3d 713, 718 (7th Cir. 2009). Proof of the underlying offense of money laundering requires "that a rational trier of fact could have concluded from the record that [the defendant] knowingly used the proceeds from a specified unlawful activity in financial transactions that [1] were intended to promote the continuation of the unlawful activity, or [2] were designed to conceal or disguise the proceeds of the unlawful activity." *Id.* (quoting *United States v. Turner*, 400 F.3d 491, 496 (7th Cir. 2005); 18 U.S.C. § 1956(a)(1), (h)). Further, the Seventh Circuit has instructed that "the

11

mere spending of ill-gotten funds would not sweep the [predicate criminal offense conduct] within the money laundering statute, and that subsequent transactions must be designed to hide the provenance of the funds." *Arthur*, 582 F.3d at 719.

To survive a statute of limitations challenge, the government must show the conspiracy continued into the limitations period. Presumably, the government's position is that the conduct charged in Counts 2 through 9 occurred in furtherance of the conspiracy to conceal drug proceeds.[7] As a threshold matter, all of the conduct charged in Counts 2 through 9 occurred in 2019 and 2020, which was well *after* Ms. Lopez's proffer to law enforcement, *after* the statute of limitations had run, *after* the government's sentencing memo stated it granted "immunization of those involved in the pickup and transportation of the money," and *after* Mr. Flores testified that his wife received immunity.

The concealment element of a laundering conspiracy ends when the conspiracy is revealed to the government. *United States v. Steele*, 685 F.2d 793, 801 (3d Cir. 1982) In *Steele*, the federal government charged officers of General Electric Company with bribing a Puerto Rican official to award General Electric a contract to construct a power plant. The *Steele* defendants allegedly created and transferred a "bribe fund" through a complex series of subcontract transactions designed to conceal its source and its payment. Notably, a principal defendants' own admissions to the Department of Justice led to prosecution and conviction. On appeal, the *Steele* defendants argued their indictment was barred by the statute of

---

[7] Undersigned counsel assumes the government's conspiracy proof rests on the second factor – that she and others engaged in financial transactions to conceal or disguise the nature of drug proceeds. The government does not appear to contend Ms. Lopez and her co-defendants engaged in transactions that were intended to promote the continuation of the predicate unlawful drug activity.

12

Case: 1:21-cr-00371 Document #: 104 Filed: 03/07/22 Page 13 of 17 PageID #:413

limitations. The Third Circuit agreed. The appellate court held "conclusively that the illegal conspiracy terminated, as a matter of law, no later than [ ] the date of [defendant's] disclosure to Puerto Rican law enforcement officials." *Id.* In other words, the conspiracy terminated when the lead defendant made full disclosure to authorities; therefore, convictions that arose out of conduct occurring after such disclosure had to be reversed.

*United States v. Steele*, 685 F.2d 793, plainly stands for the proposition that the concealment objective of a laundering conspiracy ends when the conspiracy is revealed to the government. The reasoning in *Steele* was threefold: 1) the principal purpose of the conspiracy, *i.e.*, payment of the bribe and awarding of the contract, was completed; 2) the general purpose of the conspiracy, *i.e.*, to defraud the government and the public, could not continue after the scheme had been disclosed to government officials with authority to prosecute; and 3) the concealment objective was terminated by the disclosure to law enforcement. Similarly, in *United States v. Detelich*, the government stated a defendant's participation in a conspiracy ends when she "make[s] disclosures of the illegal scheme to law enforcement officials." 2009 WL 7196747 (C.A.3); *see also United States v. Greenfield,* 44 F.3d 1141, 1149–50 (2d Cir. 1995) ("the making of a clean breast to the authorities . . . is sufficient to establish withdrawal.").[8]

There was no continuous and uninterrupted conspiracy here. A critical intervening event disrupts the chain in the government's theory that the conspiracy began in 2008 and

---

[8] Whether the evidence is sufficient to establish Ms. Lopez's withdrawal from any alleged conspiracy may be an issue for the trier of fact. However, whether the charged offense falls outside of the statute of limitations – and when the offense was committed for limitations purposes – are questions the Court may address in a motion to dismiss.

13

continued until March of 2020. Simply: Ms. Lopez and others disclosed their illegal activities during multiple proffer sessions with the government over a decade ago. Any alleged conspiratorial objective to conceal drug proceeds terminated when, in 2011, Ms. Lopez disclosed the funds, their source, and told prosecutors she had used the proceeds to pay personal expenses such as her rent. It is difficult to fathom how a defendant intended to conceal the source of illegal funds after she disclosed the existence of the funds, where the funds were kept and disclosed that she had used the money to care for her family. The government could have charged Ms. Lopez in 2011 or it could have charged her during the five years that followed. It did not.[9]

### B. There is an enforceable nonprosecution agreement in this case.

Ms. Lopez moves to dismiss the Indictment entirely because there exists an implied and enforceable nonprosecution agreement. The government's 2015 sentencing memorandum of Mr. Flores explicitly states it granted "immunization of those involved in the pickup and transportation of the money." In 2018, Mr. Flores testified under oath that his wife received immunity.

Again, the timeline here is important. All of the "money laundering" conduct alleged in Counts 2 through 9 occurred in 2019 and 2020, which was well *after* the government's sentencing memo stated it granted "immunization of those involved in the pickup and transportation of the money" and *after* Mr. Flores testified that his wife received immunity.

---

[9] To the extent the government contends the conspiracy continued into the limitations period, the Court should require the prosecution prior to trial to disclose the factual basis for that contention. *Id.* at 802.

14

As a housekeeping matter, the government has maintained there is no formal, written immunity agreement that inures to Ms. Lopez's benefit. The government offers an incorrect interpretation of nonprosecution agreements. It argues that no enforceable nonprosecution agreement can exist unless the terms are reduced to writing and Ms. Lopez must produce a paper contract. However, "courts have considered unwritten immunity agreements in the past." *See United States v. Nersesian,* 824 F.2d 1294, 1320 (2d Cir.1987); *United States v. Heatley,* 39 F.Supp.2d 287, 299 (S.D.N.Y.1998). In doing so, the Court must be attentive to the fact that the state shoulders the "burden of any lack of clarity in [the] agreement, and [that] ambiguities are to be resolved in favor of defendant." *United States v. Pelletier,* 898 F.2d 297, 302 (2d Cir. 1990).

Here, whether the agreement was reduced to writing is not dispositive. And whether the testimony was intentionally elicited or nonresponsive is also not dispositive. "Interpretation of alleged nonprosecution agreements is more difficult when those agreements are oral. But the same contract principles apply, because whether the agreement is written or oral, the court must determine what the parties reasonably understood to be its terms, including intended remedies in the event of a breach." *United States v. Sattar*, No. 02 CR. 395 (JGK), 2003 WL 22510398, at *2 (S.D.N.Y. Nov. 5, 2003). "[E]ven if no actual agreement is determined to exist, according to principles of promissory estoppel, the Government can be held to any clear and unambiguous promise of immunity it makes to a defendant, upon which the defendant reasonably relied to his or her detriment." *United States v. Rosario,* 237 F.Supp.2d 242, 244–45, 248 (E.D.N.Y.2002)

Two facts – the government's 2015 sentencing memo and Mr. Flores's 2018 El

Chapo trial testimony – taken together create Ms. Lopez's reasonable belief of immunity and the government should be estopped from breaching that agreement. Perhaps Mr. Flores's trial testimony, standing alone, would not create a clear and unambiguous promise of immunity. But how does the government explain away its own 2015 sentencing representation that it had granted "immunization of those involved in the pickup and transportation of the money"?

Furthermore, in a letter dated March 20, 2019, E.D. of NY Assistant United States Attorney Adam Fels summarized Mr. Flores's cooperation and indicated Mr. Flores's testimony in the El Chapo trial was so significant and truthful that he should receive a further reduction to his 14-year sentence. The government's March 20, 2019, letter adds to the quantum of evidence that there was a clear and unambiguous nonprosecution agreement that benefited Ms. Lopez.

### III.   CONCLUSION

The government's money laundering case is built upon the notion that Ms. Lopez and her co-defendants acted unlawfully to conceal the nature and source of drug proceeds. Perhaps something else was being concealed here. As Judge Castillo remarked at Mr. Flores's sentencing hearing, his cooperation means that he and his family will always have to conceal a part of themselves. It is also plausible that Ms. Lopez was trying mightily to conceal the location of her children and herself. Afterall, at the end of her 2011 proffer interview, federal prosecutors told her that "the USG (NDIL AUSA's and DEA) have concerns for her and her children's safety."

For the foregoing reasons, VIVIANNA LOPEZ moves to dismiss the Indictment.

Respectfully submitted,

/s/ 

MIANGEL CODY
TDC LAW OFFICE
1325 S. Wabash Ave. Suite 305
Chicago, IL 60605
Tel: 312-858-8330

*Counsel for Vivianna Lopez*

## CERTIFICATE OF SERVICE

The undersigned, MiAngel Cody, an attorney hereby certifies that in accordance with FED.R.CRIM. P. 49, FED. R. CIV. P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

**DEFENDANT VIVIANNA LOPEZ'S
MOTION TO DISMISS**

was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on March 3, 2022, to counsel/parties that are non-ECF filers.

/s/ MiAngel Cody
MIANGEL CODY
*Counsel for Vivianna Lopez*