UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 21 CR 371-1 |
| v. | Judge Matthew F. Kennelly |
| VIVIANNA LOPEZ | |

## GOVERNMENT'S SENTENCING MEMORANDUM

For the reasons that follow, the government believes a sentence at the low end of the Guidelines would be sufficient, but not greater than necessary, to accomplish the goals of sentencing.

## I. PRELIMINARY ADVISORY SENTENCING GUIDELINES CALCULATION

### A. Calculation

The government agrees with the Criminal History and Sentencing Guidelines calculations set forth in the Presentence Investigation Report. Defendant is a Criminal History Category I, and her total offense level is 31, which combine for an advisory range of 108-135 months' imprisonment. This calculation is based on a total amount laundered of at least $869,303.32—a number arrived at by the calculations of IRS Special Agent Jennifer Guest, as set forth in Exhibit A to the Government's Version of the Offense.

### B. Total Funds Involved in the Offense

Defendant disagrees that the offense involved a total of at least $869,303.32. As set forth in the Defendant's Version of the Offense, defendant contends her retail

purchases, student loan payments, and school tuition payments did not constitute money laundering under § 1956(a)(1)(B)(i)—as construed by *United States v. Esterman*, 324 F.3d 565, 570 (7th Cir. 2003)—because the transactions were not designed to hide the provenance of the funds involved.

In *Esterman*, the defendant stole money from a business partner by wiring the funds from an account they shared to accounts Esterman alone controlled. *Id*. at 569. Esterman then spent the money in "open and notorious" ways. *Id*. The Seventh Circuit agreed that Esterman's conduct did not meet the elements of § 1956(a)(1)(B)(i) because Esterman made no effort to disguise or conceal either his withdrawals from the shared account or the destinations of the funds he withdrew. *Id*. at 571.[1] The court concluded (*id*. at 573):

> [A] conviction for money laundering under 18 U.S.C. § 1956(a)(1)(B)(i) is valid only where there is concrete evidence of intent to disguise or conceal transactions, whether that evidence comes directly from statements by the defendant that indicate an intent to conceal, or from circumstantial evidence like unusual secrecy surrounding transactions, careful structuring of transactions to avoid attention, folding or otherwise depositing illegal profits into the bank account or receipts of a legitimate business, use of third parties to conceal the real owner, or engaging in unusual financial moves culminating in a transaction.

Here, all of defendant's alleged transactions meet the test articulated in *Esterman*. Defendant did not do as Esterman did—taking the crime proceeds and

---

[1] The court also took issue with whether there was a distinction between the underlying crime that generated the proceeds and the subsequent disposition of those funds—with the statute requiring that they be distinct transactions. Here, there is no such issue because the drug trafficking that generated the proceeds was clearly distinct from defendant's disposition of the funds.

sending it directly to retail vendors, her student loan servicer, or her children's school. Instead, defendant first took steps to disguise and conceal the source, nature, and (often) ownership of the funds. First and foremost, defendant used third parties (her aunt and sister) to conduct these transactions. With regard to retail purchases, defendant had these third parties transform the nature of the cash drug proceeds, including by having them (1) deposit the cash into their accounts and then spend the money directly for defendant's benefit, (2) deposit the cash into their account and then pay down defendant's credit card, and (3) convert the cash to money orders and provide those to the vendors. Likewise, the school tuition was paid with money orders, and defendant's student loan payments were made via bank transfers from defendant's aunt's Chase account.

In sum, this was no case of spending money personally and directly after generating the illegal proceeds. It was a multistep process intended to conceal the nature of the funds and to distance the funds from defendant (who'd been under scrutiny from the government going back to the turning in of the $4 million).

\*      \*      \*

Defendant asks the question of how buying an exercise bike amounts to money laundering, but that episode from this case is a perfect example of money laundering as articulated by *Esterman*. Rather than take cash drug proceeds to the bike company and order a bike, defendant's aunt and sister were instead both used as intermediaries to spend the drug money in a way designed to avoid the raising of

3

eyebrows. Defendant told her aunt which bike and accessories to buy, and her aunt shared the information with defendant's sister. The sister then used her credit card to make the purchase, and defendant's aunt gave the cash drug proceeds to defendant's sister. This series of steps to make one purchase is a far cry from the "open and notorious" conduct described in *Esterman*.

*    *    *

Defendant also objects to the government's calculation of the funds in part based on the ledgers they were recorded in. To alleviate any concerns, the government will have the ledger exhibits available at the sentencing hearing and will be prepared to walk the Court through them, to the degree necessary. However, these ledgers simply reflect the conduct described above. All of these ledgers were recovered from defendant's aunt's house. Laura Lopez kept meticulous notes of how she spent the drug money as directed by defendant. The ledgers reflect the transfer of money through bank transfers, money orders, and the paying down of credit cards.

## C. Leadership

Defendant object to the 4-level leadership enhancement, but this argument is without merit. Defendant acknowledges she directed her sister and aunt, so the only other question is whether the offense involved five or more people and it clearly did. At a minimum, the offense involved defendant, her sister, her aunt, Valerie Gaytan, and Armando Flores. Under Application Note 2 of Guideline §3B1.1, the defendant need only have led at least one of them.

4

## II.  DEFENDANT SHOULD RECEIVE A SENTENCE AT THE LOW END OF THE GUIDELINES RANGE

A sentence at the low end of the Guidelines range is sufficient, but not greater than necessary, to comply with the principles set forth in 18 U.S.C. § 3553(a).

### A.  Nature and Circumstances of the Offense

In summary, defendant stored away cash drug proceeds generated by her husband and his brother. Defendant spent those proceeds between 2008 and 2020 in ways she knew were designed to conceal the fact that it was leftover drug money. Defendant did so even after she and her co-defendant, Valerie Gaytan, turned in about $4 million in drug proceeds that was represented to the government as being the remaining cash from the drug operation. This was false, however, and likely intended to divert the government's attention.

In the course of this offense, some of the drug proceeds that remained available to defendant were stored in Chicago. Defendant lived outside of Chicago, however. Accordingly, defendant's sister (Bianca Finnigan) and aunt (Laura Lopez)—both of whom lived in the Chicago area—helped defendant spend the cash drug proceeds in ways that defendant knew were designed to conceal the fact that the funds involved were drug proceeds. Defendant, Finnigan, and Laura Lopez did this through several methods. First, at the direction of defendant, Laura Lopez sent quantities of defendant's cash drug proceeds via U.S. Priority Express mail to defendant and other individuals that defendant specified. Second, at the direction of defendant, Laura Lopez purchased money orders and gift cards using defendant's cash drug proceeds and delivered or mailed them

5

as defendant specified. Third, Laura Lopez deposited cash drug proceeds into her own personal bank account and then used the funds to make payments on a credit card used by defendant. Similarly, Finnigan gave defendant access to a credit card that was under the name of Finnigan and her spouse, and defendant used this credit card to make purchases. Finnigan then deposited cash drug proceeds at the bank and made payments against the credit card balances. Fourth, Laura Lopez and Finnigan deposited cash drug proceeds at the bank and used the funds to pay for products and services requested by defendant. Fifth, Finnigan deposited cash drug proceeds into her savings account and transferred funds to the bank account of defendant.

### B. History and Characteristics of Defendant

In aggravation, defendant grew up in a relatively stable home. She graduated from high school and took post-secondary classes. Even during the course of the offense, defendant started and ran her own business. In short, defendant had the opportunity and capacity to earn a living through legitimate work. Nevertheless, defendant chose instead to live off her husband's ill gotten gains.

In mitigation, defendant's childhood had serious negative aspects. PSR ¶¶ 48-49.

### C. Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence

This is a serious offense and defendant's sentence should reflect that. The drugs that were sold to generate the funds at issue undoubtedly caused harm to

individuals within the United States both directly and indirectly. Individuals were harmed directly because drug addiction ruins the lives of users and the lives of their family members. But drug addiction also causes indirect harm to the community, including by encouraging theft, burglary, and homelessness.

Further, defendant's offense persisted over a period of a decade or more, and it consisted of many individual conscious decisions to continue to engage in the conspiracy.

## III. GOVERNMENT'S PROPOSED TERMS OF SUPERVISED RELEASE

Consistent with the Seventh Circuit's guidance in *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015), the government recommends the imposition of a term of supervised release of two years. In order to promote the sentencing objectives of deterring recidivism, protecting the public, and assisting in the defendant's rehabilitation and reintegration into society, the government recommends that the two-year term of supervised release include the conditions set forth below, which largely echo those proposed by Probation.

### A. Mandatory Conditions

The following mandatory conditions would serve to afford adequate deterrence to criminal conduct, protect the public, and assist in defendant's rehabilitation:

- Not commit another federal, state or local offense;

- Not unlawfully possess a controlled substance;

7

- Submit to the collection of a DNA sample from the defendant at the direction of the U.S. Probation Office if the collection of such a sample is authorized pursuant to 42 U.S.C. § 14135a(a);

**B.    Discretionary Conditions of Supervision**

The following conditions would serve to facilitate supervision by the probation officer, thus assisting in encouraging the defendant's compliance with the law and deterring the defendant from future crimes:

- Remain within the jurisdiction where the defendant is being supervised, unless granted permission to leave by the court or a probation officer (Discretionary Condition #14);

- Report to the probation officer as directed by the probation officer (Discretionary Condition #15);

- Permit the probation officer to visit the defendant at home, work, at a community service location, or other reasonable location specified by a probation officer, at any reasonable time, and to confiscate any contraband in plain view of the officer (Discretionary Condition #16);

- Notify a probation officer promptly, within 72 hours, of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer (Discretionary Condition #17);

8

- Notify a probation officer within 72 hours of being arrested or questioned by a law enforcement officer (Discretionary Condition #18);

- Not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the Court (Special Condition #11).

The following conditions would support the defendant's rehabilitation and reintegration into the community and would help ensure that the defendant is engaged in lawful pursuits:

- Seek, and work conscientiously at, lawful employment or, if you are not gainfully employed, you shall pursue conscientiously a course of study or vocational training that will equip you for employment (Discretionary Condition #4);

- Refrain from knowingly meeting or communicating with any person whom the defendant knows to be engaged, or planning to be engaged, in criminal activity (Discretionary Condition #6);

- Refrain from excessive use of alcohol, and from use of a narcotics drug (Discretionary Condition #7);

- Refrain from possessing a firearm, destructive device, or other dangerous weapon (Discretionary Condition #8);

9

- Participate, at the direction of a probation officer, in a mental health treatment program, and shall take any medications prescribed by the mental health treatment provider (Discretionary Condition #9);.

- If unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least 20 hours of community service per week at the direction of the U.S. Probation Office until gainfully employed. The amount of community service shall not exceed 200 hours (Special Condition #3);

## IV. CONCLUSION

For the foregoing reasons, the government requests that the Court sentence Vivianna Lopez to the low end of the Guidelines range.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:     /s/ *Andrew C. Erskine*
ANDREW C. ERSKINE
ERIKA L. CSICSILA
Assistant U.S. Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-1875

Dated: June 30, 2023